**John MILLS, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2002–SC–000216–MR.

Supreme Court of Kentucky.

May 19, 2005.

Rehearing Denied Sept. 22, 2005.

---

**9.** 17 S.W.3d 878 (Ky.2000).　　**10.** *Id.* at 887.

312

Christopher N. Lasch, Goodwin & Lasch, Elizabeth Stovall, Assistant Public Advocate, Department of Public Advocacy, Louisville, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, David A. Smith, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice KELLER.

## I. INTRODUCTION

On August 30, 1995, Appellant, John Mills, was arrested for the murder of A.L. Phipps. At trial, the jury found Appellant guilty of Murder, First–Degree Burglary, First–Degree Robbery, and sentenced him to death. The primary facts of Appellant's case, upon which we rely here, except where a more specific discussion is necessary, are recounted in Appellant's direct appeal, wherein we affirmed the judgment of the trial court.[1] Appellant began post-conviction proceedings by filing a motion under RCr 11.42. The trial court entered an order scheduling an evidentiary hearing for September 6, 2000. On July 10, 2000, Appellant filed a motion to recuse the trial judge, who had presided over the trial, from hearing the RCr 11.42 motion. Instead of holding an evidentiary hearing on the RCr 11.42 motion on September 6, 2002, the trial court held a hearing on the motion to recuse. On October 2, 2000, the trial court entered an order overruling the motion to recuse. On July 27, 2001, the trial court entered an order overruling the RCr 11.42 motion without a hearing. Next, Appellant filed a motion under CR 59.05 asking the trial court to reconsider its ruling on the RCr 11.42 motion. The trial court overruled this motion in an order dated February 6, 2002. Appellant now appeals to this Court as a matter of right[2] and claims that the trial court erred in refusing to strike the Commonwealth's response to his RCr 11.42 motion, in applying a heightened pleading standard, in not conducting an evidentiary hearing, in finding that a judicial privilege barred the testimony of the trial judge's former law clerk, and in refusing to recuse from ruling on the judicial privilege issue. We affirm the trial court's overruling of the RCr 11.42 motion in part and reverse in part and remand for an evidentiary hearing on several of Appellant's claims.

## II. APPELLANT'S CR 59.05 MOTION AND THE TIMELINESS OF HIS APPEAL

Before addressing the Appellant's claims of error, we must address a procedural matter, namely, whether Appellant's notice of appeal of the trial court's ruling on his RCr 11.42 motion was timely filed. The trial court entered its order overruling Appellant's RCr 11.42 motion on July 27, 2001. A copy of the order was mailed to

1. *Mills v. Commonwealth*, 996 S.W.2d 473 (Ky.1999), *cert. denied,* 528 U.S. 1164, 120 S.Ct. 1182, 145 L.Ed.2d 1088 (2000).

2. KY. CONST. § 110(2)(b).

Appellant's attorney, who received the document on July 31, 2001. On August 6, 2001, Appellant's attorney mailed to the trial court a motion pursuant to CR 59.05 to alter, amend, or vacate the order overruling the RCr 11.42 motion. The motion was entered by the clerk on August 13, 2001.

On February 6, 2002, the trial court entered an order overruling Appellant's CR 59.05 motion. The trial court held that Appellant's CR 59.05 motion was untimely because it was entered seventeen days after the order overruling the RCr 11.42 motion and that the motion was inappropriate because CR 59.05 was inapplicable to proceedings under RCr 11.42. Nonetheless, in the interest of judicial economy, the trial court addressed Appellant's motion on the merits and overruled it. Appellant mailed his notice of appeal on March 6, 2002. The circuit clerk's office received the notice on March 7, 2002, and the notice was entered on March 13, 2002.

During the course of litigating the appeal, the Commonwealth moved to have the appeal dismissed as untimely on the grounds that the appeal was not filed within the thirty-day period for filing a notice of appeal prescribed by RCr 12.04(3). The Commonwealth argued that CR 59.05 does not apply to RCr 11.42 proceedings, thus the time for filing an appeal was not suspended by filing the CR 59.05 motion. We initially granted the Commonwealth's motion by order dated October 14, 2003. Appellant moved the Court to reconsider, and we withdrew the October 14, 2003, order and passed a decision on the issue to the merits of the appeal.

Appellant argues that CR 59.05 does apply to RCr 11.42 proceedings. In support of this contention, Appellant cites to *Crane v. Commonwealth*,[3] where we noted that "CR 59.05 is applicable to criminal cases."[4] The context of that statement is important. *Crane* involved a direct appeal from a wanton murder conviction. The appellant had previously been convicted, but his conviction was reversed by the federal courts in a habeas action. At his second trial, the appellant moved to recuse the judge, who had presided at the first trial, because of comments the judge allegedly made during the sentencing phase of the first trial. After an evidentiary hearing, the judge denied the motion. The appellant raised the issue in his appeal. We noted that the appellant had not attacked the final judgment with a CR 59.05 motion, even though the rule was applicable to criminal cases. We noted several other reasons why the appellant was not entitled to relief, including the fact that his original motion to disqualify the judge did not include the necessary affidavit, thus rendering the motion deficient. As such, the statement regarding CR 59.05 was not essential to the holding and does not control the result in this case.

It is also important to note that the statement in *Crane* that CR 59.05 applied to criminal proceedings was predicated on *Silverburg v. Commonwealth*,[5] which only addressed the issue in passing. In *Silverburg*, the trial court entered an order modifying its sentence on a perjury conviction. The modification order, however, was not entered until thirty-eight days after the judgment imposing the sentence was entered. We noted that the civil rules control when the criminal rules do not provide a time period for action, and that because there was no relevant time-period listed in the criminal rules for the modification, the ten-day time period in CR 59.05 applied.

**3.** 833 S.W.2d 813 (Ky.1992).

**4.** *Id.* at 813.

**5.** 587 S.W.2d 241 (Ky.1979).

Because the trial court had lost jurisdiction over the case after the ten-day period, we held that the modification order was void.

Even if *Crane* is correct that CR 59.05 applies to criminal proceedings, it is not clear that the rule applies to *all* aspects of criminal procedure or what effect it has on the running of the time to file a notice of appeal. RCr 13.04 provides that the civil rules will be applicable to criminal proceedings, but only "to the extent [the civil rules are] not superseded by or inconsistent with the[ ] Rules of Criminal Procedure." RCr 11.42 provides a means to collaterally attack a sentence imposed. Though RCr 11.42 and CR 59.05 provide similar relief, we cannot say that RCr 11.42 is inconsistent with or supersedes CR 59.05. This is especially true when we consider that CR 59.05 allows for a motion to alter, amend, or vacate a "judgment" and RCr 11.42(7) contemplates the issuance of a "final order or judgment of the trial court in a proceeding brought under this rule." As such, we must admit that the statements in *Crane* and *Silverburg* were technically correct, at least insofar as we cannot say that any of the civil or criminal rules prohibits a defendant from filing a motion under CR 59.05 after the trial court rules on the RCr 11.42 motion.

That a defendant has a right to file such a motion, however, does not directly address the issue before us because the Commonwealth's ultimate claim is Appellant's notice of appeal was filed well outside the thirty-day time period that began running when the trial court overruled the RCr 11.42 motion. There is no question that Appellant's notice of appeal was not filed within thirty days of the overruling of the RCr 11.42 motion. The relevant question, then, is whether the timely filing of the CR 59.05 motion suspends the running of the thirty-days provided for in RCr 12.04(3).

Under the civil rules concerning appellate procedure, the filing of a CR 59.05 motion suspends the running of the time for an appeal, and the entry of an order overruling a CR 59.05 motion resets the time for appeal so that a party has the full thirty-days to begin the appeals process.[6] Note, however, that this suspension is not an inherent aspect of CR 59.05 (or the rest of CR 59, for that matter); instead, the suspension of the running of the time for an appeal arises solely from the action of a specific civil rule, CR 73.02(1)(e), concerning appellate procedure.

While many of the civil rules are applicable to criminal proceedings through the action of RCr 13.04, as noted above, those civil rules that conflict with or have been superseded by the criminal rules are not applicable. The criminal rules contain their own rules of appellate procedures, and, as such, the appellate rules found in the civil rules have been superseded by analogous provisions of the criminal rules. The criminal rules even go so far as to specifically reincorporate a number of the civil rules pertaining to appeals into the criminal rules.[7] As such, only those appellate civil rules listed in RCr 12.02 apply to criminal appellate procedures. The civil rule that suspends the running of the time for an appeal—CR 73.02(1)(e)—is not listed in RCr 12.02.

---

6. CR 73.02(1)(e).

7. RCr 12.02; *see also Demoss v. Commonwealth*, 765 S.W.2d 30, 31 (Ky.App.1989) ("The Rules of Criminal Procedure deal with criminal cases and appeals from criminal actions. The specific civil rules set out in RCr. 12.02 are the civil appellate rules which apply in criminal actions.").

■ This reading of the rules, when combined with our earlier case law, means that a CR 59.05 motion can be filed in a criminal case, but such a filing would have no real effect because the time for an appeal still runs after the filing of a CR 59.05 motion. Because the provisions of the civil rules that allow for suspension of the time for appeal upon the filing of a CR 59.05 motion do not apply to criminal cases and there is no analogous provision in the criminal rules, we can only hold that the filing of a CR 59.05 after a trial court has ruled on an RCr 11.42 motion does not suspend the running of the time for an appeal. The thirty days provided for in RCr 12.04(3) begins running upon the entry of the trial court's order overruling the RCr 11.42 motion.

■ We must note, however, that it is not surprising that Appellant thought that the filing of a CR 59.05 motion would operate as it would in the context of a civil lawsuit, i.e., that the motion would suspend the running of the time for an appeal, especially given that we have heard appeals from at least two RCr 11.42 decisions where the appellant had also filed a CR 59.05 motion without discussing the effect of such a motion on the running of time for an appeal.[8] More recently, our own Court of Appeals, albeit in an unpublished opinion, has read CR 59.05 as suspending the running of the time for an appeal of an RCr 11.42 ruling.[9] Also, the language in our earlier cases was strong and without

exception: "CR 59.05 *is applicable* to criminal cases."[10] While we agree with those cases in that CR 59.05 is technically applicable to criminal proceedings, given the analysis we engaged in above, it is obvious that those earlier cases did not tell the whole story. Appellant, however, was entitled to rely on those cases in prosecuting both his CR 59.05 motion and his appeal. As such, we decline to use such a technical understanding of the rules to deny Appellant's appeal of his RCr 11.42 motion, which challenges his *sentence of death,* in this case.

■ Note, however, that this exception arises only because of the nature of Appellant's case, i.e., because he has been sentenced to death and because the analysis in our previous cases was incomplete. Now that we have clarified the admittedly complex manner in which these particular criminal and civil rules interact, the dual circumstances giving rise to the exception to which Appellant is entitled will not be available to other RCr 11.42 litigants after this opinion becomes final. As such, with this limited exception, we hold that until such time as the criminal or civil rules are amended, the filing of a CR 59.05 motion (after the finality of this opinion) will not suspend the running of the time for filing a notice of appeal in a criminal proceeding, and the interpretation of the rules we have described above shall be applicable in all future cases.

**8.** *See Sanders v. Commonwealth,* 89 S.W.3d 380, 385 (Ky.2002) (consolidating and addressing the denial of both an RCr 11.42 motion and a CR 59.05 motion where the appellant had filed a pro se notice of appeal following the denial of his RCr 11.42 motion and his attorney, who was appointed after the filing of the notice of appeal, filed a CR 59.05 motion and notice of appeal upon denial of the CR 59.05 motion); *Hodge v. Commonwealth,* 68 S.W.3d 338, 347 (Ky.2001) (Wintersheimer, J., dissenting) (noting that following the denial of an RCr 11.42 motion, the appellant filed a CR 59.05 motion, which alleged more specific facts than the RCr 11.42 motion).

**9.** *See Turner v. Commonwealth,* No.2002–CA–001447–MR, 2004 WL 758285 (Ky.App.2004) (unpublished).

**10.** *Crane,* 833 S.W.2d at 813 (emphasis added).

## III. DENIAL OF MOTION TO STRIKE THE COMMONWEALTH'S RESPONSE

Appellant's first claim of error is that the trial court erred in refusing to strike the Commonwealth's response to his RCr 11.42 motion. On April 15, 2000, Appellant filed his RCr 11.42 motion with the trial court and the trial court entered an order staying Appellant's execution. The Commonwealth did not file its response until July 20, 2000. Appellant argues that because the response was filed more than twenty days after the filing of the RCr 11.42 motion, it was filed well outside the twenty-day period provided for in RCr 11.42(4), and that the response should have been stricken as a result. The trial court ruled that the response was not filed late because it is not clear that the circuit clerk mailed the notice required by RCr 11.42, or at the very least, that no notice was mailed before July 21, 2000.

The trial court was correct. The circuit clerk is responsible for notifying the Attorney General and the Commonwealth's Attorney in writing as soon as an RCr 11.42 motion is filed.[11] The Commonwealth has twenty days "after the date of mailing of notice by the clerk ... in which to serve an answer on the movant."[12] Appellant, however, has offered no proof that the clerk sent notice of Appellant's motion to the Commonwealth more than twenty days before the Commonwealth served its answer. Appellant claims that the Commonwealth was given a copy of the motion on April 15, 2000, and that this was sufficient notice. While it may be true that the Commonwealth received a copy of the motion, such receipt does not start the running of the twenty days. And the simple fact of the matter is that the computer-generated case history record contains no entry indicating that the clerk ever notified the Commonwealth. The only reference to notification in the record is a hand-written note, dated July 21, 2000 (one day after the Commonwealth filed its response), which states that the clerk sent a copy of the motion to the Attorney General on that date.

Appellant points out that on April 18, 2000, the Commonwealth served a motion seeking to prohibit *ex parte* filings in the RCr 11.42 proceeding. He implies that this proves that the clerk served the Commonwealth with notice of the RCr 11.42 motion. It is equally possible, however, that the Commonwealth filed this motion in response to Judge Messer's order, dated April 15, staying the execution of Appellant due to receipt of a motion under RCr 11.42 or in response to the RCr 11.42 motion. This is supported by the fact that the Commonwealth's motion does not mention any details of Appellant's RCr 11.42 motion, instead stating simply that "[s]ome capital RCr 11.42 litigants have in the past attempted to file certain motions ... *ex parte*."

Furthermore, mere awareness of the fact that Appellant had filed a motion is insufficient to begin running the response period allowed under RCr 11.42(4). Instead, the rule explicitly states that the period begins upon receipt by the Commonwealth of written notification from the clerk.[13] That the Commonwealth knew of Appellant's motion is irrelevant. Given that the trial court found that the Commonwealth's response was filed within twenty days of receipt of notice, if indeed notice was ever sent out, we cannot say

11. RCr 11.42(4).

12. *Id.*

13. RCr 11.42(4).

that the trial court erred in refusing to strike the response from the record.

We also note that it is unclear that the trial court would have been required to strike the Commonwealth's response if it had been filed late. Such a decision would have been within the trial court's sound discretion.

## IV. HEIGHTENED PLEADING RE-QUIREMENT AND REFUSAL TO CONDUCT AN EVIDENTIARY HEARING

Appellant also claims that the trial court erred by imposing a heightened pleading requirement. The bulk of Appellant's brief addresses his related claim that the trial court improperly refused to hold an evidentiary hearing to resolve the factual disputes raised by his RCr 11.42 motion. In the course of addressing this meta-issue, Appellant discusses many of the individual claims raised in his RCr 11.42 motion. Because the heightened pleading and evidentiary hearing claims are related, we address them together.

 As to the heightened pleading claim, Appellant points to several instances in the order overruling the RCr 11.42 motion where the trial court dismissed a claim because it was "speculative" and/or because Appellant had failed to include extrinsic evidence in the form of an affidavit or a report. Appellant notes that the RCr 11.42 motion is a verified pleading that makes factual claims. As such, Appellant is correct in that extrinsic proof is not necessary for an RCr 11.42 motion. The motion need only "state specifically the grounds on which the sentence is being challenged and the facts on which the movant relies in support of such grounds." [14] The requirement for a specific statement of facts, however, means that the motion must contain "more than a shotgun allegation of complaints." [15] And the movant "has the burden to establish convincingly that he was deprived of some substantial right which would justify the extraordinary relief afforded by the post-conviction proceeding." [16] Without a "minimum factual basis," the motion may be summarily overruled.[17] Furthermore, RCr 11.42 exists to provide the movant with an opportunity to air known grievances, not an opportunity to conduct a fishing expedition for possible grievances,[18] and post-conviction discovery is not authorized under the rule.[19]

 This does not mean, however, that evidentiary hearings are never appropriate in RCr 11.42 cases, which brings us to Appellant's second major claim, i.e., whether he was entitled to an evidentiary hearing. We have established a two-part test for determining whether an evidentiary hearing is necessary to evaluate an RCr 11.42 motion. First, the movant must show that he "is entitled to relief under the rule." [20] This can be done by showing that " 'there has been a violation of a constitutional right, a lack of jurisdiction, or such a violation of a statute as to make the judgment void and therefore subject to collateral attack." ' [21] Second, the movant must

---

**14.** RCr 11.42(2).

**15.** *Stanford v. Commonwealth*, 854 S.W.2d 742, 748 (Ky.1993).

**16.** *Haight v. Commonwealth*, 41 S.W.3d 436, 442 (Ky.2001).

**17.** *Stanford*, 854 S.W.2d at 748.

**18.** *Haight*, 41 S.W.3d at 445.

**19.** *Sanders v. Commonwealth*, 89 S.W.3d 380, 392 (Ky.2002).

**20.** *Hodge v. Commonwealth*, 68 S.W.3d 338, 342 (Ky.2001)

**21.** *Id.* (quoting *Lay v. Commonwealth*, 506 S.W.2d 507, 508 (Ky.1974)).

show that " 'the motion raises an issue of fact that cannot be determined on the face of the record.' " [22]

■■■ With that said, an RCr 11.42 motion is limited to issues that were not and could not be raised on direct appeal.[23] An issue raised and rejected upon direct appeal may not be relitigated in an RCr 11.42 motion by claiming that it amounts to ineffective assistance of counsel.[24]

While the merits of Appellant's claims in this regard are addressed below, we must first address the Commonwealth's argument in reply. Instead of addressing the substance of Appellant's argument, the Commonwealth's primary response is as follows, with emphasis reproduced as it appears in the brief: *"Appellant never requested an evidentiary hearing, even after the original September 6, 2000 date was used for another aspect of the case. It is procedurally defaulted. This Court should enforce its own procedural rules."* The Commonwealth's brief then quotes from the trial court's order, wherein the court noted that Appellant did not request a hearing *after October 2000* (i.e., after the court's ruling on the recusal motion, some five months after filing the RCr 11.42 motion), and claims that because Appellant's claim to an evidentiary hearing was procedurally defaulted, "it is neither necessary nor appropriate to address the merits of his ... argument of what might have been proved somehow." The Commonwealth then argues generally that Appellant did not specifically name witnesses he would call or evidence that he would present at such a hearing and that Appellant's claims are mostly matters that could have been, or were, raised on direct appeal, thus bar-

ring Appellant relitigation of those matters under the guise of an RCr 11.42 motion.

■■■ Appellant, however, *did* request an evidentiary hearing in his original RCr 11.42 motion. The trial court recognized this fact on the first page of its order overruling the motion when it noted that Appellant "filed his motion for RCr 11.42 relief where he requested that his motion be granted or, in the alternative, *that his motion be set for an evidentiary hearing ...."* [25] It is possible that the Commonwealth meant that Appellant defaulted his claim to an evidentiary hearing by not asking a second time for an evidentiary hearing. The Commonwealth's brief alludes to this more subtle argument when it later refers to Appellant's failure to request an evidentiary hearing after the recusal hearing held on September 6, 2000. Having already requested an evidentiary hearing, however, Appellant was not required to ask for such a hearing again in order to preserve the issue for our review. As such, we will address the merits of Appellant's claims.

**A. Claims That Were Properly Dismissed as Speculative or For Other Reasons and That Did Not Require an Evidentiary Hearing**

■■■ Many of the instances of the trial court's description of Appellant's claims as speculative or as lacking external evidence are simply determinations by the trial court that Appellant had failed to allege sufficiently specific facts to show an error in the original trial or in Appellant's lawyer's performance. Where Appellant has failed to allege sufficient facts to constitute a deprivation of a substantial right, then

**22.** *Id.* (quoting *Stanford v. Commonwealth,* 854 S.W.2d 742, 743–44 (Ky.1993)).

**23.** *Sanborn v. Commonwealth,* 975 S.W.2d 905, 909 (Ky.1998).

**24.** *Id.*

**25.** (Emphasis added.)

the trial court should dismiss the claim. This is the essence of *Stanford*'s command that "[w]ithout a minimum of factual basis, contained in the verified RCr 11.42 motion, the motion should be summarily overruled."[26] In such instances, a movant clearly would not be entitled to an evidentiary hearing.

■ We must note from the outset, however, that we address Appellant's arguments in this area in a distilled form. This is not to say that we have not carefully considered Appellant's claims, but such treatment is necessary given the volume of claims. Appellant's RCr 11.42 motion was 126 pages long and included four primary claims: ineffective assistance of counsel, prosecutorial misconduct, judicial misconduct, and premature issuance of the death warrant. The ineffective assistance of counsel claim alone includes twenty-seven subdivisions (not counting two claims repeated verbatim), and many of these include further subdivisions, for a total of approximately eighty-five individual claims of ineffective assistance. The other primary claims are also subdivided, so that the RCr 11.42 motion contains over 100 individual factual allegations of error. Though Appellant has not pursued all of these claims on appeal, enough are present that "shotgun approach" would not be an inappropriate description. And though Appellant's pleadings are not as voluminous as in some other cases we have heard,[27] Appellant's claims still constitute an "inundating flow [that] threatens to drown out the legitimate arguments . . . ."[28] As such, we address Appellant's argument in a summary fashion where possible.

### 1. Ineffective Assistance of Counsel Claims

■ The trial court dismissed many of Appellant's sub-claims in this area because they did not rise to the level of ineffective assistance of counsel. As noted above, under the *Hodge* approach to determining whether a movant's claims warrant an evidentiary hearing, the RCr 11.42 motion must show entitlement to relief (e.g., a constitutional violation) and raise an issue of fact that cannot be determined on the face of the record.[29] A claim of ineffective assistance of counsel is such a claim of a constitutional violation.[30] We address whether an RCr 11.42 movant is entitled to relief for an ineffective assistance of counsel claim under the standard established in *Strickland v. Washington*,[31] which we adopted in *Gall v. Commonwealth*.[32] *Strickland* first requires that Appellant show that his lawyer's performance was deficient, which requires showing that the lawyer made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.[33] Appel-

---

26. *Stanford,* 854 S.W.2d at 748.

27. *See, e.g., Sanborn v. Commonwealth,* 754 S.W.2d 534, 538 n. 1 (Ky.1988) (noting that "[t]he Brief for Appellant raise[d] sixty-one assignments of error and [wa]s 358 pages in length (the 'Appendix' and 'Reply Brief' not included")).

28. *Id.*

29. *Hodge v. Commonwealth,* 68 S.W.3d 338, 342 (Ky.2001)

30. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel.").

31. 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

32. 702 S.W.2d 37 (1985).

33. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

lant must also show that the deficient performance prejudiced his defense, i.e., that there is a reasonable probability that but for counsel's error the result of the proceeding would have been different.[34]

Upon review, we must indulge a strong presumption that counsel acted reasonably and effectively.[35] We must also recognize that a defendant is not guaranteed errorless counsel or counsel that can be judged ineffective by hindsight, but rather counsel rendering reasonably effective assistance.[36] Finally, we must consider the totality of evidence before the jury and assess the overall performance of counsel throughout the case in order to determine whether the identified acts or omissions overcome the presumption that counsel rendered reasonable professional assistance.[37]

### a. Expert Witnesses

A large portion of Appellant's ineffective assistance of counsel claim was aimed at arguing that his trial lawyer should have sought the assistance of a variety of expert witnesses, including a neuropharmacologist, a psychiatrist or psychologist, a medical doctor, a metallurgist, and an expert on the treatment options available in Kentucky's prisons. Appellant argues that the first three experts would have helped with various aspects of Appellant's case (e.g., his intoxication and EED defenses, whether he was competent to stand trial, whether he was mentally retarded, whether his confession was reliable). Appellant claims that the metallurgist would have been able to testify about the rust on a key to the victim's house found in Appellant's yard

that the police claim Appellant stole from the victim, thus showing that the key was dropped there long before the night of the murder. Appellant argues that the testimony as to treatment options would have gone to mitigation during the penalty phase.

The trial court properly dismissed several of Appellant's subclaims regarding expert witnesses on the grounds that they were speculative. For example, Appellant claims his lawyer should have had a mental health expert to testify regarding Appellant's EED claim, which was based on the victim's alleged sexual advances towards Appellant. In his RCr 11.42 motion, Appellant notes that "[i]t is unknown if [he] has ever suffered any form of sexual abuse, and the effects of such abuse would have upon him in a situation in which he believed he was being subjected to abuse again." Appellant then claimed that a mental health expert should have been consulted to "explore these issues." In dismissing this claim, the trial court noted: "Mills' claim is speculative and fails to assert specific facts which, if true, would justify RCr 11.42 relief." The trial court was correct. A claim that certain facts *might* be true, in essence an admission that Appellant does not know whether the claim is true, cannot be the basis for RCr 11.42 relief.

The trial court also properly dismissed several of Appellant's expert witness claims on the grounds that the issues had already been addressed on the direct appeal. Appellant claims that the various experts would have helped his attorney in pursuing various aspects of his

---

**34.** *Id.* at 694, 104 S.Ct. at 2064.

**35.** *Id.* at 689–90, 104 S.Ct. at 2065.

**36.** *Haight v. Commonwealth,* 41 S.W.3d 436, 442 (Ky.2001).

**37.** *Foley v. Commonwealth,* 17 S.W.3d 878, 884 (Ky.2000).

defense, including whether he was competent to stand trial, whether he was intoxicated at the time of the crime, whether his intoxication affected the voluntariness of his confession and his consent to search his house, and whether Appellant is mentally retarded (and thus not subject to the death penalty). These issues were raised and rejected on Appellant's direct appeal.[38] While Appellant's new claim that his lawyer was ineffective in dealing with these issues is creative, it is simply a recasting of direct appeal issues as ineffective assistance of counsel. Such claims are inappropriate in an RCr 11.42 proceeding.[39]

 Appellant also argues that his counsel was deficient in failing to obtain an expert to support his defense of intoxication. The trial court dismissed this claim in part because "excessive alcohol consumption has been held not to mitigate murders that were found to have been intentionally committed." In Kentucky, however, voluntary intoxication may reduce an intentional murder to a lesser-included offense.[40] Intoxication is also a mitigating factor in the penalty phase of a capital offense.[41] This is especially important in Appellant's case because he claims that he cannot remember the events on the night of the murder due to the fact that he was so intoxicated as to have been suffering a blackout.

However, "[w]e have held that when a defendant claims his counsel is ineffective

by not making a[ ] ... motion for expert assistance he must establish how he was prejudiced by the alleged failure of counsel. In claiming that the defense was deficient, the accused must establish that the performance by the attorney was objectively unreasonable and how the alleged error prejudiced his defense."[42] The trial court was correct in noting that the jury could have evaluated Appellant's level of intoxication from his videotaped confession. At trial, the jury heard testimony from several witnesses describing Appellant as "very intoxicated" before the murder and "under the influence" after the murder. They were told that Appellant had a blood alcohol level of .18 at about 10:30 p.m., and that this test result was indicative of an even higher level of intoxication at the time of the murder. They also heard Appellant say in his taped confession that he had consumed Xanax and Valium prior to killing the victim. Although it is *possible* that testimony from an expert might have convinced the jury that Appellant was even more intoxicated, it is unlikely that this would have changed the outcome of the trial. Appellant has not met his burden of showing that there is a reasonable probability that testimony from an expert would have changed the outcome of the proceeding.

 Furthermore, Appellant has not given any proof that he knows of a

---

38. See Mills v. Commonwealth, 996 S.W.2d 473, 480–81 (Ky.1999) (denying Appellant's claim that his confession and consent to search were involuntary because of intoxication and low intelligence); id. at 481 (discussing the basis for the present mental retardation claim, namely Appellant's low IQ of 76); id. at 481–82 (holding that Appellant voluntarily waived his Miranda rights); id. at 485–86 (allowing waiver of a competency hearing, even though statute requires one, because the evidence in the record, a psychiatric report, said Appellant was competent).

39. *Sanborn v. Commonwealth,* 975 S.W.2d 905, 909 (Ky.1998).

40. *Fields v. Commonwealth,* 12 S.W.3d 275, 282 (Ky.2000); *Slaven v. Commonwealth,* 962 S.W.2d 845, 857 (Ky.1997).

41. KRS 532.025(2)(b)(7).

42. *See Hodge v. Commonwealth,* 116 S.W.3d 463, 470–71 (Ky.2003) (citations omitted).

specific expert who is willing to testify in a manner helpful to the defense or what such testimony would consist of. Discovery is not authorized in an RCr 11.42 proceeding.[43] Appellant has, in effect, asked this Court to allow him to engage in the sort of "fishing expedition" that we have consistently rejected. We refuse to alter the rule on this matter.

### b. Lack of Investigation and Failure to Present More Evidence of Intoxication

■ Appellant also argues that his trial lawyer was deficient because he "conducted no investigation in this case." Appellant offers little support for this statement, and, in fact, did not raise this specific issue in his RCr 11.42 motion. Instead, this claim appears to be part and parcel of most of Appellant's other claims. To the extent that this claim undergirds Appellant's other claims, we address it with those other issues, and simply note that we have previously held that vague allegations, including those of failure to investigate, do not warrant an evidentiary hearing and warrant summary dismissal of the RCr 11.42 motion.[44]

■ Appellant does make one specific and extended allegation in this regard in his brief. He claims that his lawyer was ineffective in not having more fully investigated and presented evidence of Appellant's intoxication. In *Norton v. Commonwealth*,[45] we previously held that a failure to present testimony establishing that a defendant was intoxicated could be grounds for an evidentiary hearing regarding deficiency of counsel. In *Norton*, the defense lawyer did not call any of the three witnesses who were willing to testify that appellant was intoxicated at the time of his arrest even though intoxication was appellant's only defense at trial.[46] This Court reversed the trial court's rejection of appellant's RCr 11.42 motion because the intoxication defense was vital to the defendant's strategy.[47] Unlike in *Norton*, however, ample evidence of intoxication was presented to the jury, as discussed above. It is unlikely that more evidence of Appellant's intoxication would have changed the outcome at trial. As such, any failure on his lawyer's part to more fully investigate and present the intoxication defense does not rise to the level of ineffective assistance of counsel. Nonetheless, because Appellant has raised several specific factual claims in this regard in his brief, we address those claims individually.

■ Appellant claims that his lawyer should have presented the testimony of Deputy Tom Gray, who filled out an affidavit in which he stated that Appellant "smelled strongly of alcohol and was slurring his speech" at the time of his arrest. Again, as noted above, the jury heard ample evidence of Appellant's intoxication. Detective Hall testified at trial that Appellant was intoxicated at the time of his arrest, and, more importantly, the jury saw Appellant's videotaped confession, which allowed them to see for themselves that Appellant was slurring his speech and behaving in an intoxicated manner. Deputy Gray's testimony would have been redundant and likely would not have changed the outcome of the proceeding.

■ Though much later in the his brief, Appellant also claims that his lawyer

---

43. *Sanders v. Commonwealth,* 89 S.W.3d 380, 392 (Ky.2002)

44. *Id.*

45. 63 S.W.3d 175, 178 (Ky.2002).

46. *Id.* at 176.

47. *Id.* at 178.

should have more fully cross-examined Detective Partin, who had testified before the grand jury and at the suppression hearing that Appellant was very intoxicated such that he could barely stand up and had to be helped by officers so that he would not fall down. Again, this testimony would have been redundant given that there was other evidence of Appellant's level of intoxication, including a videotape taken of Appellant at or near the same time that Detective Partin observed him.

 Appellant also alleges that his lawyer should have introduced a toxicology report from the University of Kentucky Hospital showing that he had drugs in his blood. The trial court dismissed this argument, saying that Appellant failed to plead this claim with the specificity required by RCr 11.42. Appellant, however, identified the specific report that should have been introduced and the relevant findings within that report. This description was sufficient to meet the requirements of RCr 11.42(2). Nevertheless, Appellant has failed to show a reasonable likelihood that introduction of the report would have changed the outcome of the proceeding. The jury heard Appellant himself say in his videotaped confession that he had taken Xanax and Valium. They also heard testimony from multiple witnesses who said that Appellant was intoxicated at the time of the arrest. The UK report would only have duplicated the substance of other testimony and was unlikely to change the outcome of the trial.

 Appellant also alleges that his lawyer was deficient in failing to interview Danny Bartello. Appellant claims that Bartello would have testified that he had given Appellant some moonshine and a coin purse on the afternoon of the murder.

Appellant admits that Bartello did not see him drink any moonshine, and Bartello could not have testified as to his level of intoxication at the time of the murder. Again, this testimony would likely not have changed the outcome at trial.

 Appellant also argues that his lawyer was deficient in failing to request an instruction as to the legal blood alcohol content (BAC) for automobile drivers in Kentucky. This instruction was not necessary and would have been utterly inappropriate. The jury was properly instructed on the defense of intoxication. The fact that the lawyer argued that Appellant's BAC was "twice the limit in Kentucky to drive a car" was probably good trial strategy, especially since Appellant's BAC was so high. Making that argument, however, does not change the fact that the BAC listed in the DUI statute relates only to the crime of DUI, not the defense of intoxication in a homicide trial. Failure to request such an instruction was not ineffective assistance, and no hearing was necessary on this issue.

### c. Missing Evidence Instruction

 Appellant next alleges that his lawyer was deficient in failing to ask for a missing evidence instruction. He points out that police investigators failed to take into custody any of the remaining moonshine that was in Appellant's house and which he had allegedly been drinking. A missing evidence instruction would require that the jury presume the missing evidence would have favored Appellant, and such an instruction *might* have bolstered Appellant's intoxication defense. Normally, a missing evidence instruction is appropriate when the Commonwealth has lost[48] or destroyed[49] evidence. We have noted,

---

48. *E.g., Tinsley v. Jackson,* 771 S.W.2d 331, 332 (Ky.1989).

49. *E.g., Sanborn v. Commonwealth,* 754 S.W.2d 534, 540 (Ky.1988).

however, that the Commonwealth's failure to collect evidence is essentially no different than losing the evidence, describing the former situation as "a distinction without a difference."[50] But the missing evidence instruction in such cases is necessary "only when the failure to preserve or collect the missing evidence was intentional and the potentially exculpatory nature of the evidence was apparent at the time it was lost or destroyed."[51] As the trial court noted, there was no bad faith on the part of the police in failing to collect the moonshine as evidence, meaning that the failure was not intentional. Thus, failure on the part of Appellant's lawyer to request a missing evidence instruction was not ineffective assistance, and no hearing was necessary to establish that.

### d. EED Defense

■ Appellant also argues that his lawyer was deficient in failing to investigate and to present fully an EED defense. Appellant points out that he has a family history of mental illness, suicide attempts, and abuse as a child. He makes no attempt, however, to prove any connection between these facts and his mental state at the time of the murder.

Instead, Appellant cites two federal cases in which counsel was found ineffective for failing to present an EED defense: *Bloom v. Calderon,*[52] and *DeLuca v. Lord.*[53] In *Bloom,* the appellant had been charged with killing his parents. The appellate court found the lawyer ineffective based on his failure to introduce evidence of extensive child abuse to support an EED defense.[54] In *DeLuca,* counsel was

found ineffective for failing to introduce evidence of rape trauma where his theory of the case was that the appellant had killed the deceased because he had previously raped her.[55]

The facts here do not rise to the level where failure to present evidence of emotional disturbance could support a finding of ineffective counsel. First, as the trial court pointed out, Appellant's claims in this regard were speculative in that the facts he alleged were in the vein of he was "likely ... sensitive" and "probably reacted" to the victim's alleged sexual advances. Second, it is clear that Appellant's lawyer did present some evidence sufficient to warrant an EED instruction because the trial court did, in fact, give such an instruction to the jury. This was not ineffective assistance of counsel, and an evidentiary hearing was not warranted.

We also note that, in this portion of his brief, Appellant again raises the question of whether his lawyer should have consulted expert witnesses. Whether that failure constitutes ineffective assistance is addressed above.

### e. Failure to Impeach Sam Shepherd

Appellant argues that his lawyer was ineffective in failing to impeach Sam Shepherd. Shepherd was a jailhouse snitch who testified at trial that Appellant had admitted that he went to the victim's house to commit a robbery and that he had stabbed the victim with two knives. Appellant claimed in his RCr 11.42 motion that his lawyer failed to introduce, among other things, evidence of Shepherd's prior

**50.** *Collins v. Commonwealth,* 951 S.W.2d 569, 573 (Ky.1997).

**51.** *Estep v. Commonwealth,* 64 S.W.3d 805, 810 (Ky.2002).

**52.** 132 F.3d 1267 (9th Cir.1997).

**53.** 77 F.3d 578 (2nd Cir.1996).

**54.** *Bloom,* 132 F.3d at 1277.

**55.** *DeLuca,* 77 F.3d at 583.

felony convictions, an agreement to testify against another defendant, several felony charges then pending in Tennessee and Kentucky, and the fact that Shepherd had access to newspapers describing the crime and Appellant's legal papers.

■ Appellant's lawyer did question Shepherd about the criminal charges against him in front of the jury. Appellant's lawyer suggested that the prosecution had cut a deal for Shepherd's testimony, and he also exposed the fact that Shepherd had entered into a plea agreement in his own trial in front of the same court. Shepherd also admitted in front of the jury that he was not generally an honest man. Although a lot of detail may not have come out, Appellant's lawyer's cross-examination was sufficient to raise serious doubts about Shepherd's credibility in the minds of the jury.

■ Additionally, any deficiency in the lawyer's impeachment of Shepherd did not prejudice the defense. Most of the substance of Shepherd's testimony was identical to the facts Appellant himself admitted to during his taped confession. And as Appellant's own brief points out, "Sam Shepherd's testimony concerning John Mills' alleged jailhouse confession contained no information that was not already known to the police." For this reason, the prosecution could easily have called other witnesses to give the same substantive testimony. Thus, Appellant's lawyer was not ineffective in this regard, and Appellant was not entitled to a hearing on this issue.

## f. Failure to Pursue the Competence and Mental Retardation Issues

■ Appellant again raises the claims that his lawyer was ineffective in failing to prove Appellant incompetent to stand trial and in failing to prove that Appellant was mentally retarded. As we have already noted above, these issues were addressed on Appellant's direct appeal and cannot be recast as ineffective assistance of counsel claims.[56]

■ For the sake of completeness, however, we will note that Appellant fails to allege sufficient facts to support his contention that counsel could, with due diligence, have proven that he was incompetent to stand trial or that he is mentally retarded. Appellant argues that he had "an extensive history of drug and alcohol abuse, including blackouts regarding the events of the crime, depression and a low IQ." But the psychiatric evaluation of Appellant that the trial court received concluded that he was competent to stand trial. And the IQ score that Appellant cites to indicates that his IQ is 76, which is high enough above the limit of 70[57] that it was not ineffective assistance of counsel not to pursue a claim of mental retardation.

## g. Failure to Suppress Evidence from Appellant's Home and Appellant's Videotaped Statement

■ Appellant next alleges that his lawyer was deficient in failing to file a motion to suppress evidence gathered in a search of Appellant's home and in failing to properly challenge the introduction of

---

**56.** *See supra* notes 39–40 and accompanying text.

**57.** *See* KRS 532.130–.140 (applying an IQ of 70 as one of several factors in finding a defendant mentally retarded and thus ineligible for the death penalty); *Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002) (holding that mentally retarded defendants are ineligible for the death penalty under the Eighth Amendment and noting an IQ of 70 as a recommended factor in that determination).

Appellant's videotaped statement. Appellant separately addresses the portion of his statement wherein he refers to his prior incarceration. We concluded in Appellant's direct appeal that he gave valid consent to a search of his residence,[58] that his confession was voluntary,[59] and that the admission of reference to his prior incarceration was not reversible error.[60] Again, Appellant cannot relitigate these issues as ineffective assistance of counsel.

### h. Failure to Advise Appellant of the Possibility of an *Alford* Plea

■ Appellant alleges that his lawyer was ineffective in failing to advise him regarding the possibility of making a plea under *North Carolina v. Alford.*[61] Appellant claims that he "declined the [Commonwealth's] offer because he had no memory of the crime and did not want to plead guilty if he was not in fact guilty." He now claims that if he had known about the possibility of an *Alford* plea, he likely would have taken the offer because he could still maintain his innocence. In making this claim, Appellant disregards the fact that "[a]n *Alford* plea is a 'plea of guilty,' regardless of any denial of underlying facts, and clearly constitutes a criminal conviction."[62] As such, Appellant would still have pled guilty. Appellant's own claim that he would "not want to plead guilty if he was not in fact guilty" makes it highly unlikely that he would have pled guilty even if he had known about the

availability of an *Alford* plea. And, at the very least, we cannot say that there was a reasonable probability that the result would have been different had Appellant known of the option.

### i. Failure to Move to Recuse the Trial Judge

■ Appellant also argues that his lawyer was deficient in failing to move to recuse the trial judge due to the fact that he had presided over Appellant's prior juvenile commitment.[63] According to Appellant, the judge should have recused himself because his outside knowledge made him more likely to accept the jury's recommendation of a death sentence. The U.S. Supreme Court, however, has previously held that "opinions formed by the judge on the basis of ... prior proceedings, do not constitute a basis for a bias or partiality unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."[64] There is no evidence of antagonism here, meaning that the necessity of recusal was unlikely.

Appellant points out that KRS 26A.015(2)(a) and SCR 4.3000 require a judge to disqualify himself "in any proceeding where he has personal knowledge of disputed evidentiary facts concerning the proceedings." Here, however, Appellant's criminal history was not a disputed evidentiary fact, and it did not concern the

---

**58.** *Mills v. Commonwealth,* 996 S.W.2d 473, 480 (Ky.1999).

**59.** *Id.* at 480–81.

**60.** *Id.* at 485.

**61.** 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

**62.** *Pettiway v. Commonwealth,* 860 S.W.2d 766, 767 (Ky.1993).

**63.** Recusal of the trial judge is one of several issues that Appellant raises in multiple parts of his brief. While separately addressing the various aspects of Appellant's claim in this regard may require some repetition, we note that it is an unfortunate necessity given Appellant's approach in his brief and the original RCr 11.42 motion.

**64.** *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).

proceeding. In fact, due to Appellant's status as a minor at the time of his prior conviction, his criminal record was never entered into evidence in this case.

Moreover, in *Marlowe v. Commonwealth*,[65] we held that a judge is not required to recuse himself based on personal knowledge about a case unless that knowledge has given rise to actual bias. In *Marlowe*, the trial judge heard the defendant confess his *guilt* in an aborted guilty plea.[66] The judge accepted a jury's recommendation to sentence the defendant to death.[67] This Court held that his decision not to recuse himself was proper because there was "no evidence of actual bias or impartiality, only bare speculation."[68] Accordingly, the trial judge here was not required to recuse himself. Appellant has presented no evidence of actual bias, and no bias is apparent from the record. Thus, counsel's decision not to move for recusal was reasonable under the circumstances.

### j. Failure to Refute Evidence of Robbery and Burglary

██ Appellant also alleges that his lawyer was deficient in failing to refute evidence of robbery and burglary. First, Appellant points out that his lawyer failed to tell the jury that the bottle of pills found in his home was not the most recent bottle ordered by the victim at his pharmacy, and that other pill bottles had been found in the attic of Appellant's home and were left over from when the victim's children lived in the house. It is unlikely, however, that this evidence would have swayed the jury. The fact that the victim refilled his prescription before the murder does not prove that Appellant legally acquired the bottle

he was accused of stealing. Furthermore, the bottle was found under Appellant's bed, and not in the attic. Appellant's wife also testified that she had never seen the bottle before. Therefore, Appellant's allegation fails to overcome the strong presumption that counsel represented him in a reasonable manner.

██ Second, Appellant argues that counsel did not tell the jury that the change purse found under his bed was given to him by Danny Bartello. Appellant points out that Bartello's testimony about the change purse would have contradicted the testimony of Terry Sutherland, who identified the purse found under Appellant's bed as belonging to the victim. Though we cannot know whether the jury would have believed Bartello over Sutherland, at first glance, the failure even to contact Bartello in the investigation leading up to trial seems profoundly unreasonable in light of what Appellant now claims about Bartello. This is especially true because Bartello talked extensively with Appellant a few hours before the murder and allegedly gave him the moonshine responsible for his intoxication.

The trial court dismissed this claim by noting the Appellant did not file an affidavit of Bartello. As noted above, such extrinsic evidence of a factual claim is not necessary in an RCr 11.42 motion. We note, however, that in dismissing this claim, the trial court also stated that Appellant did not say why he did not know about this before trial, and did not say whether he even told his trial attorney about Bartello. This more properly gets to the essence of Appellant's claim. Even though Appellant makes this allegation about Bartello in the context of an ineffec-

**65.** 709 S.W.2d 424 (Ky.1986).

**66.** *Id.* at 426.

**67.** *Id.* at 427.

**68.** *Id.* at 428.

tive assistance of counsel claim, his RCr 11.42 motion did not allege that he had told his lawyer about Bartello or that his lawyer knew or even had reason to know about Bartello. Appellant was in the best position to give this information to his lawyer (and, we note, he cannot claim he was too intoxicated to remember because it was Bartello who on the same day allegedly gave Appellant the moonshine that he claims led to his intoxication on the night of the murder, thus he was allegedly given the change purse before he became intoxicated and suffered the claimed blackout). As such, Appellant's motion did not make a sufficient factual claim in this regard to show that his trial lawyer's performance was deficient, and the trial court was correct in denying both relief and an evidentiary hearing as to this claim.

 Appellant also claims that his attorney's failure to investigate and address the presence of various keys around the victim's property, including Appellant's residence, and the possibility that the keys found in Appellant's yard were left by the victim's grandchildren was ineffective assistance because one of the prosecution's claims is that the keys found in Appellant's yard had been stolen from the victim. It is unlikely that such evidence would have changed the result at trial, thus this claim fails the second prong of the *Strickland* test.

## 2. Judicial Misconduct

Appellant also claims that he was entitled to an evidentiary hearing as to his allegations of judicial misconduct. Appellant claims that the trial judge committed misconduct in four ways: by failing to correct Sam Shepherd's alleged misstatements on the stand, by failing to recuse despite his alleged extra-judicial knowledge of Appellant's background, by allegedly conducting a meeting with the jurors in Appellant's case after they rendered their verdict, and by allowing certain police officers who participated in the investigation to act as bailiffs during the trial.

### a. Sam Shepherd's Misstatements

 As to this first claim, Appellant claims that Shepherd testified incorrectly about the status of his own case, which was pending before the trial judge. Appellant points out that Shepherd gave an inconclusive answer when asked whether charges against him had been "concluded" when, in fact, his charges were still pending. He fails, however, to prove that Shepherd's misstatement was material to the outcome of his trial. Shepherd's potential bias was clearly presented to the jury by way of testimony about his plea bargain in his own case and his admission that he is not generally an honest man. The fact that entry of judgment had been delayed in Shepherd's case would not have caused a reasonable jury to evaluate his testimony differently.

 Appellant also alleges that the trial judge violated judicial ethics by conducting an independent investigation into the facts surrounding the allegation regarding Shepherd. He points out that the judge's order rejecting Appellant's RCr 11.42 motion cited the videotape in the Shepherd trial wherein the judge noted that he would postpone sentencing so that Shepherd would be available to testify in Appellant's trial. It was not error for the judge to take notice of proceedings in his own court. The reference to the videotape in the order was simply to provide the parties with a means to verify the truth of his statement about the reason why he withheld entry of judgment in Shepherd's case. This allegation was not sufficient to warrant an evidentiary hearing.

### b. Judge's Knowledge of Appellant's Juvenile Record

▮▮▮▮ Next, Appellant alleges judicial misconduct in Judge Messer's failure to recuse himself even though he allegedly had knowledge of Appellant's juvenile record. The law on this issue is recounted above in Part III(A)(1)(i). The judge's knowledge of Appellant's prior record, however, is insufficient to require him to recuse himself in the absence of some other evidence of bias or animosity.[69] Appellant offers no such evidence and does not allege facts sufficient to show bias. Furthermore, absent bias, recusal is required only where the trial judge's knowledge as to a particular issue pertains to a disputed evidentiary fact that is material to the proceedings, which is not the case here.[70] Given the lack of evidence of actual bias, the trial judge acted properly in refusing to recuse himself.

### c. Judge's Alleged Meeting with Jurors

▮▮▮ Appellant next alleges that the trial judge met with the jurors after they recommended the death sentence. He claims that the judge's failure to disclose the substance of this alleged discussion constituted judicial misconduct. The only evidence Appellant offers for his theory that there was a meeting is the hearsay statement of Ellen Benzing, the judge's former law clerk. Benzing worked with the Department of Public Advocacy after her clerkship. During that time, she spoke with the attorney who was handling Appellant's direct appeal and who worked in a nearby office, and indicated that after the jury in Appellant's trial had returned the death verdict, they had refused to

leave until they had a chance to speak with the judge. The next day, the trial judge entered an order prohibiting the attorneys from contacting the jurors. Appellant's direct appeal attorney testified as to these matters by avowal at a recusal hearing.

The trial judge disposed of this claim by noting that it was clearly refuted by the record. The record reflects that after the jurors returned their verdict, they were excused and left the courthouse with a police escort. A few minutes later, a bailiff spoke with the police escort via radio and notified the judge that the jurors had safely made it to their cars. Only then did the judge recess the case and leave the courtroom. While it is conceivable, as Appellant alleges, that the jurors could have "changed their minds in the parking lot, returned to the courthouse and located the judge," this theory is pure speculation. Appellant does not even claim that this is what happened; rather, he claims only that he deserves an evidentiary hearing to determine the truth. Again, discovery is not allowed in RCr 11.42 proceedings. A movant must allege in the verified RCr 11.42 motions sufficient facts to require reversal. Appellant failed to do so with regard to his claim, and as such, Judge Messer acted properly in dismissing this claim.

### d. Failure to Remove Investigating Officers as Bailiffs

▮▮▮ Finally, Appellant alleges misconduct in the trial judge's failure to remove two officers from duty as bailiffs. Deputies Grey and Bolton were among the officers who arrested Appellant, and both were present at the time of his confession. Both also served as bailiffs during Appel-

---

**69.** *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994); *Marlowe v. Commonwealth,* 709 S.W.2d 424 (Ky.1986).

**70.** *Woods v. Commonwealth,* 793 S.W.2d 809, 812 (Ky.1990).

lant's trial. Deputy Bolton testified for the prosecution during the hearing on Appellant's motion to suppress his videotaped confession, but neither deputy testified at trial.

In *Turner v. Louisiana*,[71] two arresting officers served as bailiffs during appellant's murder trial, and there was evidence that both fraternized extensively with the jurors.[72] Both also testified for the prosecution, contradicting crucial aspects of appellant's story so that the credibility which the jury attached to their testimony "must inevitably have determined" whether they sentenced appellant to death.[73] The Supreme Court reversed appellant's conviction, noting that the fact that the officers both testified for the prosecution and served as officers of the court would have significantly bolstered their credibility, thus "undermin[ing] the basic guarantees of trial by jury."[74]

The role of the bailiffs here does not rise to the level found to be prejudicial in *Turner*. First, neither bailiff testified in front of the jury, thus the neutral role of the court was never called into serious question. Second, there is no evidence that the bailiffs fraternized with the jurors here. Third, nothing the two deputies saw when they arrested Appellant was in direct conflict with any part of Appellant's story at trial. Appellant has therefore failed to establish convincingly that the trial court should have removed the bailiffs.

### B. Claims That Require an Evidentiary Hearing

We believe, however, that the trial court improperly dismissed some of Appellant's claims, without holding an evidentiary hearing, on the grounds that the claims were speculative and/or unsupported by extrinsic evidence. Appellant's brief raises several of these issues multiple times under various subject headings (e.g., under both the ineffective assistance claim and under the prosecutorial misconduct claim). Because we hold that the trial court should have held an evidentiary hearing on these issues, we are simply grouping those claims based on the facts alleged. We leave it to the trial court to resolve any factual ambiguities.

### 1. Alternate Killer and *Brady* Material

Appellant's weightiest claims of ineffective assistance of counsel were that his trial lawyer had failed to adequately present what we have described as an "alleged alternative perpetrator" or "aaltperp" theory,[75] i.e., the theory that another person had killed the victim, and that his lawyer failed to ask for exculpatory material pursuant to *Brady v. Maryland*,[76] which would have included evidence as to the possibility that another person killed the victim. Appellant reiterates these allegations under his claim of prosecutorial misconduct, alleging that the Commonwealth had a duty to turn over this information.

For support of these claims, Appellant discusses various factual allegations in the RCr 11.42 motion, including the following: (1) that the victim's relatives engaged in drug dealing and other criminal activity

**71.** 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965).

**72.** *Id.* at 467–68, 85 S.Ct. at 547.

**73.** *Id.* at 473, 85 S.Ct. at 550.

**74.** *Id.* at 474, 85 S.Ct. at 550.

**75.** *Beaty v. Commonwealth*, 125 S.W.3d 196, 207 (Ky.2003).

**76.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

on his property; (2) that the victim's girlfriend had threatened to kill him and was looking for someone to commit murder on her behalf; (3) that someone broke into the victim's house after his death and tampered with his belongings; (4) that Appellant's house, which was owned by the victim and which contained property, including illegal drugs, belonging to the victim's children, was burned down only one week after his arrest; (5) that there was evidence, in the form of empty bank bags and money wrappers, that a large amount of money had been stolen from the victim; (6) that weapons other than Appellant's pocket knife had been used to kill the victim; (7) that a drug report existed that showed that Appellant had benzodiazepine in his blood; (8) that fingerprint results from the victim's home were inconclusive; (9) that the victim was in dire need of a large amount of money to pay his taxes; (10) that the victim's family members had threatened to kill him and his girlfriend; and (11) that a bloody note was found on the victim's dining room table and that the note had the address of a woman named Anna Matthews, who Appellant claims has a long criminal history, who was allegedly at the victim's house the day he was murdered, and who left the state shortly after the crime.

Perhaps the most troubling bit of evidence that Appellant discusses is an audiotape that he claims was made by the police at the time of his arrest before they made the videotape of his confession. Appellant claims that this recording contains his statement to the police that someone else went to the victim's house with him on the night of the murder. Appellant's attorney knew of this audiotape and asked that it be turned over. The prosecutor asked the police to procure the tape and turn it over, but they appear to have never followed through. The tape was not presented at trial.

Appellant claims that many of these facts were learned from Eddie Mott, a private investigator who had been hired by the victim's family to look into the crime. Appellant states that Mott knew the victim's family had doubts about Appellant's involvement in the murder, that the victim's family had the tape recording of Appellant made at the scene, that Mott had played the tape for the police, that the police never provided a copy of the tape to Appellant's trial lawyer, and that the trial lawyer knew about the tape but did not try to get a copy of it. Appellant also claims that he has no memory of the night of the murder because he was experiencing an alcohol-induced blackout.

The trial court dismissed most of these claims by noting that they were speculative or unsupported by other evidence. With regard to the audiotape, the trial court specifically noted: "This is apparently the same tape Mills claimed earlier in his RCr 11.42 motion had been given to Detective Partin by Mott. Here, Mills says Detective Partin never got the tape, although it was 'clearly exculpatory.' Mills has not provided this Court a copy of the tape or a transcript of the tape. Mills has not provided Eddie Mott's report or an affidavit of Eddie Mott. This claim is speculative." The trial court addressed Appellant's *Brady* claim by noting that his "claims . . . are not based on information in the record."

If Appellant's factual claims about the evidence regarding another possible killer, especially the claims regarding the motives and identities of *specific* persons, are correct, then it is likely that Appellant's lawyer's performance was not reasonably effective. It is also reasonably likely that if such evidence existed and had been presented at trial, then the outcome would

have been different. Furthermore, presentation of an "aaltperp" theory implicates the "fundamental right to a fair opportunity to present a defense"[77] implicit in the Due Process Clause, which we have noted "includes the right to introduce evidence that someone other than the accused, i.e., an alleged alternative perpetrator ('aaltperp') committed the crime."[78] As such, Appellant sufficiently pled ineffective assistance of counsel both as to his lawyer's failure to pursue such a theory and failure to request *Brady* material. Furthermore, if such *Brady* material was in the hands of the prosecution, then another constitutional violation occurred. Appellant's factual claims in this regard were more specific than many of the other claims, and, by their very nature, could not be disproved by the record. The trial court admitted as much by requiring in many of these instances that Appellant prove his contentions with extrinsic evidence, e.g., in the form of a report or an affidavit, rather than disproving his claims with facts in the record. In doing so, however, it appears that the trial court, "[i]nstead of examining whether the record refuted the allegations raised, . . . focused on whether the record supported the allegations, which is the incorrect test when addressing the question of whether an evidentiary hearing to resolve issues raised in an RCr 11.42 motion is required."[79]

This is not to say that Appellant's claims necessarily require reversal of his conviction. After all, Appellant did confess to the killing on video. And we recognize that "[e]ven in a capital case, an RCr 11.42 movant is not automatically entitled to an evidentiary hearing."[80] But given the facts that Appellant has alleged, under the two-part test as to the necessity of an evidentiary hearing, i.e., a showing of entitlement to relief and an issue of fact that cannot be determined on the face of the record, we must hold that Appellant was entitled to an evidentiary hearing as to his alternate killer and *Brady* material ineffective assistance of counsel claims and his prosecutorial misconduct claims. If the trial court is correct that Appellant's claims are speculative, then he will not be able to prove his claims at the evidentiary hearing, and the trial court can address them summarily. But if there is any truth to the "aaltperp" theory, or even if another person was present (and possibly was the primary perpetrator of the crime), there is a reasonable probability that presentation of such evidence to the jury could have changed the outcome, at least in regard to sentencing.

We also note that although Appellant is entitled to an evidentiary hearing, the trial court is not required to allow a retrial in the context of that hearing. Appellant is not even allowed to engage in discovery.[81] Appellant will be allowed to prove his claims not disposed of in this opinion and nothing more.

### 2. Mitigation Evidence

Appellant also argues that his lawyer was deficient in failing to present compelling mitigation evidence in the penalty phase. Appellant's RCr 11.42 motion also alleges that his lawyer made his first preparations for the penalty phase when the jury was considering the guilt phase ver-

77. *Harris v. Commonwealth,* 134 S.W.3d 603, 608 (Ky.2004).

78. *Id.*

79. *Hodge v. Commonwealth,* 68 S.W.3d 338, 340 (Ky.2001).

80. *Stanford v. Commonwealth,* 854 S.W.2d 742, 743 (Ky.1993).

81. *Sanders v. Commonwealth,* 89 S.W.3d 380, 392 (Ky.2002).

dict, even though he had previously asked for a continuance of the case because his contract with DPA did not include capital cases. The lawyer's preparation for the penalty phase consisted of asking only a few questions that he had hastily written by hand on the back of his copy of the jury instructions. The lawyer asked those few questions of Appellant's sister, whose testimony was limited to describing her relationship with Appellant, the size of their family, how far Appellant went in school, the fact that he had accidentally shot himself in the leg before, that he was married and had children, that his mother was still living, that his father had drowned about eleven years before, and that Appellant had a problem with alcohol. Her direct testimony lasted less than three minutes.

Appellant's RCr 11.42 motion points to a variety of other evidence that could have been presented in mitigation, including, among other things, the huge impact the death of Appellant's father had on him, further evidence of Appellant's mental limitations (including that he had been in special education classes and had a low IQ), the poverty and hardship he suffered during childhood, and that he suffered from severe depression and had actually been attempting suicide when he shot himself in the leg.

■ As we noted in *Hodge v. Commonwealth:* [82] " 'An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." ' [83] In determining this issue, the trial court must determine if a reasonable investigation would have uncovered the mitigating evidence and then whether the failure to present this evidence to the jury was a tactical choice.[84] Though Appellant's lawyer did present *some* mitigating evidence during the penalty phase and, as the trial court noted, some of this evidence was hinted at in the guilt phase, its brevity and lack of detail likely rendered it all but useless. And when combined with the lawyer's last minute preparation for the penalty phase, the failure to present other mitigating evidence certainly raises questions as to whether the lawyer's performance in this regard was reasonably effective. However, "[b]efore any possible mitigating evidence can be weighed in a meaningful manner, that evidence first must be determined and delineated. This is the proper function of an evidentiary hearing." [85] As such, we follow the ruling in *Hodge* and note that "[a]n evidentiary hearing must be held in this case to determine whether the failure to introduce mitigating evidence was trial strategy, or an abdication of advocacy." [86]

## V. OVERRULING MOTION TO RECUSE TRIAL JUDGE FROM PRESIDING OVER RCr 11.42 PROCEEDINGS

■ Appellant separately raises the issue of whether the trial judge erred by failing to recuse from the RCr 11.42 proceeding. We must first address the Commonwealth's argument that Appellant's recusal claim is procedurally defaulted because he did not avail himself of KRS 26A.020 [87] after making a motion before

---

82. *Hodge v. Commonwealth,* 68 S.W.3d 338 (Ky.2001).

83. *Id.* at *344* (quoting *Porter v. Singletary,* 14 F.3d 554, 557 (11th Cir.1994)).

84. *Id.*

85. *Id.* at 345 (emphasis added).

86. *Id.* (internal quotation marks omitted).

87. At least, we assume the Commonwealth meant KRS 26A.020. The Commonwealth's brief refers to KRS 29A.020, which authorizes the Supreme Court to "make and amend such procedural rules as may be necessary to implement the provisions of this chapter." This

the trial court under KRS 26A.015. We have previously rejected the Commonwealth's remedy exhaustion argument by noting that KRS 26A.020 is merely an alternative procedure to KRS 26A.015.[88] As such, Appellant has not defaulted this claim, and we must address Appellant's various claims that the trial judge's impartiality might reasonably have been questioned, thus requiring him to recuse himself from the RCr 11.42 proceeding.

Appellant claims the trial judge should be recused because he had extra-judicial knowledge about some of the issues that could have affected his decision on the RCr 11.42 motion and because this knowledge made him a material witness in the RCr 11.42 proceeding. Appellant points to three areas in particular—the judge's knowledge of Sam Shepherd's other criminal cases, of his alleged meeting with jurors following the jury's death verdict, and knowledge of Appellant's juvenile record—all of which have been addressed already in part in Section V(A)(2) above. Because Appellant failed to raise colorable claims as to those issues, as addressed above, it was unnecessary for the trial judge to recuse himself from the RCr 11.42 proceeding.

## VI. WHETHER THE TRIAL COURT ERRED IN FINDING THAT JUDICIAL PRIVILEGE BARRED THE TESTIMONY OF MS. BENZING

Appellant argues that the trial judge erred in finding that judicial privilege barred the testimony of his former law clerk, Ellen Benzing, because there is no

judicial privilege under Kentucky law and because Ms. Benzing waived any such privilege by her disclosure while working at the DPA. As discussed above, in section V(A)(2)(c), the trial court correctly held that the record refutes Appellant's incomplete and vague allegations of an improper meeting. As such, we need not determine whether the trial judge was correct in ruling that there exists a judicial privilege that extends to judicial law clerks.

## VII. WHETHER THE TRIAL JUDGE ERRED BY FAILING TO RECUSE FROM RULING ON THE JUDICIAL PRIVILEGE ISSUE

Appellant alleges that the trial judge also erred in failing to disqualify himself from ruling on the judicial privilege issue. This claim must fail for the same reason as the preceding claim. The judicial privilege issue was rendered moot by the fact that the record contradicted Appellant's allegations. Therefore, Appellant has not established convincingly that he was deprived of a substantial right.

## VIII. CONCLUSION

For the reasons set forth above, we affirm the trial court's order overruling Appellant's RCr 11.42 motion, except as to Appellant's claims regarding his attorney's alleged ineffective assistance and the prosecutor's alleged misconduct relating to the possibility that another person killed the victim and possibility that exculpatory evidence was not turned over to the defense, and as to Appellant's claim of ineffective assistance of counsel related to the presen-

---

statute does not seem relevant to the Commonwealth's argument. This is likely just the result of a typo, since KRS 26A.020 actually refers designation of retired judges as special judges.

**88.** *Nichols v. Commonwealth,* 839 S.W.2d 263, 265 (Ky.1992) ("When a party or counsel seeks to disqualify or recuse a judge from proceeding further in any matter, a motion can be filed with the judge under K.R.S. 26A.015 or an affidavit pursuant to K.R.S. 26A.020. It would also appear that an aggrieved party can do either or both.").

tation of mitigating evidence during the penalty phase. We remand this case for an evidentiary hearing on those issues.

All concur.